1            UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS (Boston)

3                    No. 1:18-cr-10399-WGY

4

5   UNITED STATES OF AMERICA

6

7   vs.

8

9   BRIAN WALSHE

10

11                    * * * * * * * * *

12

13                For Hearing Before:
                  Judge William G. Young

14

15                   Sentencing

16

17                United States District Court
                  District of Massachusetts (Boston.)
                  One Courthouse Way
18                Boston, Massachusetts 02210
                  Tuesday, February 20, 2024

19

20                    * * * * * * * *

21

22         REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter
23             United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
24                   rhrbulldog@aol.com

25

1                    A P P E A R A N C E S

2

3    TIMOTHY E. MORAN, ESQ.
     KUNAL PASRICHA, ESQ.
4    CAROL E. HEAD, ESQ.
        United States Attorney's Office
5        One Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
6        (617) 748-3963
         E-mail: Timothy.e.moran@usdoj.gov
7        For the United States of America

8

9    TRACY A. MINER, ESQ.
        Miner Siddall, LLP
10       101 Federal Street, Suite 650
         Boston, Massachusetts 02110
11       (617) 202-5890
         Email: Tminer@msdefenders.com
12       For the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2        (Begins, 2:30 p.m.)

3        THE CLERK:  Criminal Matter 18-10399, the United

4    States of America versus Brian Walshe.

5        THE COURT:  Good afternoon.  Would counsel

6    identify themselves.

7        MR. MORAN:  Good afternoon, your Honor, Timothy

8    Moran for the United States.

9        MS. HEAD:  Good afternoon, your Honor, Carol Head

10   for the United States.

11       THE COURT:  And good afternoon to you both.

12       MS. MINER:  And good afternoon, your Honor, Tracy

13   Miner for Brian Walshe.

14       THE COURT:  And may I speak directly to

15   Mr. Walshe?

16       MS. MINER:  Absolutely.

17       THE COURT:  Mr. Walshe, have you read the

18   presentence report that's been prepared in your case?

19       THE DEFENDANT:  I acknowledge I've read that

20   report, yes, your Honor.

21       THE COURT:  And have you talked it all with

22   Ms. Miner?

23       THE DEFENDANT:  I acknowledge I've spoken to my

24   lawyer about it, yes.

25       THE COURT:  Well Ms. Miner?

1          THE DEFENDANT:  Ms. Miner, yes.

2          THE COURT:  And do you think you understand it?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  Thank you.

5          Nothing's been withheld from the presentence

6     report under the rules of criminal procedure?

7          PROBATION OFFICER:  No, your Honor.

8          THE COURT:  Thank you.

9          Now before we proceed to sentencing, there is an

10    issue in determining the calculations necessary to the

11    presentence report.  I have read all the papers and, um,

12    including the stipulation of facts, and as I understand

13    it the issue is whether there should or ought not be a

14    2-level adjustment for obstruction during the period

15    after the guilty plea and prior to sentencing?

16         Is that right, Mr. Moran and Ms. Miner?

17         MR. MORAN:  Yes, your Honor.

18         MS. MINER:  Yes, your Honor.

19         THE COURT:  All right.

20         Now I've read the papers, but I -- I am usually

21    and I'm sure I will be in this case, aided by brief oral

22    argument.  So it's the government who bears the burden

23    of proof.  I'll hear the government.

24         MR. MORAN:  Yes, your Honor.

25         I think the obstruction enhancement, um, is

comfortably wise here.  Your Honor has read the
stipulation of facts, those are the facts the parties
could agree to, I think, um, with the idea that we would
not pursue, um, a trial before your Honor for several
reasons.  And let me make one thing very clear, which I
think will remain clear at the hearing.  We are not
arguing regarding the pending murder charges against
Mr. Walshe, we think, um, in no way am I trying to --

THE COURT:  The papers have made that clear.  At
this time, in this proceeding, Mr. Walshe stands
innocent of those charges --

MR. MORAN:  Correct, your Honor.

THE COURT:  -- they would not, in any event,
factor into any sentence this Court might impose upon
him.  So we'll take that as a given.

MR. MORAN:  Yes, thank you.

THE COURT:  It is disputed that the 2-level
adjustment for obstruction should apply, and I
understand you agree that based upon the stipulation and
today's argument, this Court might resolve that matter.
And I'm prepared to do so.  So I'll hear you on the
merits, on that issue.

MR. MORAN:  It comes down to this, your Honor.  As
your Honor is well aware, um, Mr. Walshe was required to
fill out certain financial statements for probation

1    which they use in preparing the presentence report,

2    that's an obligation that's imposed upon him by the

3    sentencing process.  Even if it were not posed upon him,

4    he nevertheless signed those forms under the pains and

5    penalties of perjury.  It's particularly necessary here

6    because this is a fraud case and one of the issues that

7    the Court would have to take into account is what to do

8    about restitution, fine, and other matters.

9        It's clear that he obtained money and assets from

10    his father's estate.  Um --

11        THE COURT:  But the defense's brief argues that

12    that was in a representative capacity.

13        MR. MORAN:  I think that's sort of attempting to

14    rationalize it after the fact, your Honor, because I'm

15    not sure that sort of the niceties of the probate law

16    necessarily bear on the core of the facts here, which is

17    that his role may have been as a personal

18    representative, that was what he -- the role he assumes

19    in order to run the estate and take the money for

20    himself.  The bottom line is that there are money and

21    assets which are gone.  That money did not go to the

22    estate, because he's no longer the personal

23    representative, the estate had not received those assets

24    or funds, and the money did not go to the victims nor

25    was it made known to the Court.

1      So, um, in whatever role in which he was, at that

2   time, placed, it seems to me doesn't really matter.

3   What matters is that the money was not made known to the

4   Court and has not appeared anywhere else.  We may never

5   know the amount of money with any precision because the

6   state matter is not going to go forward now in light of

7   everything else that has happened.

8      THE COURT:  Well it's suggested that because of

9   the pending state charges he's been unable to have

10   access to papers that could clear all this up.  What do

11   you say?

12      MR. MORAN:  That, um, not participating in the

13   probate matter after the fact doesn't change the fact

14   that when he submitted those forms to probation he had

15   received money and did not make that known to the Court.

16   He's basically saying, "Hey I got caught, but it's not

17   my fault, I can't tell you what happened."

18      I'll also note that the First Circuit has been

19   clear, the, um, burden for materiality, the First

20   Circuit said, is not a stringent one.  We're really

21   arguing about -- we know there's a falsity, but what

22   we're really arguing about, I think, is whether, um,

23   it's material or not, and that burden, particularly in a

24   fraud case, is not a hard one.  I think given the fact

25   that it's clearly something false and it's a fraud case,

1    that should have been made known to the Court.

2          THE COURT:  Thank you.

3          Ms. Miner.

4          MS. MINER:  Thank you, your Honor.

5          There is a dispute of facts, obviously.

6    Mr. Walshe received those funds in a representative

7    capacity.  Just like me, if I were arrested today, I

8    would have put all my IOLTA funds in there, they might

9    come to me at some point in time, they might have to go

10    back to the client.  It's the same thing, you're holding

11    it in a representative capacity.

12          THE COURT:  But isn't that the point?  Even if I

13    accept that, and given the stipulation there's evidence

14    that supports it, um, isn't it the law he's supposed to

15    say, "I received these funds but in a representative

16    capacity, they're not mine to deal with"?

17          MS. MINER:  I don't believe so.  I don't think

18    there's anything on the probation financial statement

19    which says "Are you holding funds in a representative

20    capacity?"  There are specific instances where they say

21    "Are you a trustee and a beneficiary of a trust?  Are

22    you the beneficiary of a trust where somebody else is

23    holding the funds?"  They're looking for how much money

24    you have to pay to the Court, right?

25          THE COURT:  And they infer --

1        MS. MINER:  And it couldn't have been any of that.

2        THE COURT:  Forgive the interruption.  But they

3   infer, the government says, obstruction from the fact

4   that significant funds are not accounted for here.

5        MS. MINER:  There are significant funds not

6   account for and I would suggest (A) that's a fact for

7   the probate court, it doesn't go to his net worth.  If

8   the probate court had said, "Okay, you owe the estate

9   $22,000, that would have been a debt and you should have

10  put that on it," but there was no finding about how much

11  money it was, that was in the total, that's what they

12  spent these months trying to figure this out.  So there

13  was no debt that he had to report.  There were no assets

14  that he had to report because at that period of time he,

15  um, understood that none of the funds were his.

16        They agree that he got funds in and he sent funds

17  out as a personal representative, it wasn't like he

18  didn't have legitimate expenditures as a personal

19  representative, and had this matter gone forward in the

20  probate court he would have -- a determination would

21  have been made and he would perhaps owe money to the

22  estate.  And once that determination was made, it should

23  have shown up on a financial statement.  But until any

24  such determination is made, they're not his assets to be

25  able to give to this Court, he doesn't have them in an

1  ability to pay restitution, to pay a fine.  And that's

2  what a defendant's personal statement is looking for,

3  how much money does he have to, um, pay to the Court.

4  And I will say it wasn't like -- if anything, if

5  the Court -- if it's so, as the government argues, that

6  he owes money to the estate, and that hasn't been

7  determined yet, all that does is make his asset less.

8  He didn't try to get out of restitution, he didn't try

9  to get out of forfeiture, he didn't even try to get out

10  of the fine.  So it wasn't like he was kind of gaming

11  the system to make himself look less wealthy than he

12  was, if anything the financial statement, if you believe

13  the government, um, overstated his assets, not

14  understated them.  And I think that's significant here

15  because one of the things the government, the Court and

16  probation is looking at, is does this defendant have the

17  assets to pay restitution, forfeiture, and a fine?

18  He never tried to share a penny of his financial

19  responsibilities, your Honor.  But even aside from that,

20  I think if you're holding money in a representative

21  capacity and you're not the beneficiary, you don't

22  expect to receive it, you know, that you don't need to

23  report it on those financial statements, if anything is

24  unclear.

25  THE COURT:  Thank you.  I --

MS. MINER: And as my client points out, that he did receive $40,000 from the estate personally, because he was the beneficiary of a life insurance policy, and that he reported, because that went to him personally. It had nothing to do with this. I mean it came through the estate, of course, but it went to him as the beneficiary and he did report that.

THE COURT: I've carefully reviewed all the written materials and, um, I am aided by your arguments, both of your arguments. I do conclude, pursuant to the sentencing guideline procedures, that it is appropriate to add 2 levels for obstruction of justice.

Now this conclusion, um, I take it, does not impair -- and I'm asking the government here, the 3-level reduction, as probation calculates it, for acceptance of responsibility?

MR. MORAN: Correct.

THE COURT: Very well. This is -- I need say no more.

Sentencing in this session of the court proceeds in four steps, the first three steps are largely arithmetic and I will go through the arithmetic now. If anyone would differ with this Court's arithmetic calculations, I'd like you to interrupt me at that time and I'll try to sort it out.

1    With the, um -- the first thing, as I understand

2  the Constitution in this quasi-determinate sentencing

3  system, is that the highest sentence that this Court

4  constitutionally could impose is the top of the

5  applicable sentencing guideline without regard to

6  anything that counts in Mr. Walshe's favor.  Here that

7  would be an adjusted offense level of 24, a criminal

8  history category 1, and this Court constitutionally

9  could sentence as high as 63 months in custody.  And I'm

10  not saying I would do that, I'm saying that

11  constitutionally such a sentence would be completely

12  appropriate.

13    The second thing this Court looks at is the

14  sentences that those who stand convicted of like

15  offenses in fact receive, and to do that I look at two

16  publicly-available databases, and one now is provided

17  for the last 3 years by the, um, the sentencing

18  commission itself, it's accurate and thorough and gives

19  us the average sentences, um, nationwide for this

20  offense and this criminal history.  I do not sentence by

21  any averages nor any algorithm, but I do look to see

22  what they are, the better to see the weight to be given

23  to the advisory sentencing guidelines.  And here, having

24  consulted that database, the average sentence is 28

25  months.

1       I also, thanks to Mr. Romanow, the Official Court

2    Reporter in this session and his predecessor,

3    Mr. Womack, I have the sentences that this Court has

4    imposed -- at least for wire fraud I have imposed, since

5    *Booker*, a sentence for wire fraud 21 times.  It's a much

6    smaller statistical grouping and this database does not

7    account for criminal history, but the average sentence I

8    have imposed has been, um, 24 months.

9       Now with those stated, as the law requires, I

10   proceed to calculate the sentencing guidelines as

11   follows.

12      Given the underlying offense level of wire fraud,

13   that gives us a base offense level of 21.  I add 1 level

14   because Mr. Walshe was convicted under 18 United States

15   Code Section 1957.  I add another two levels, as I've

16   just concluded, for obstruction of justice.  So that

17   takes us to 24.  As the government states, they're not

18   contesting a reduction for the guilty plea of 3 levels,

19   taking us back down to 21, a criminal history category

20   1.  So the guideline, um, is not less than 37 months nor

21   more than 46 months, a period of supervised release of

22   not less than 1 nor more than 3 years, a fine of not

23   less than $15,000 nor more than $150,000.  A restitution

24   in the amount of $475,000.  And there must be a

25   mandatory special assessment of $300.

1       Arithmetically are the guidelines properly

2  calculated, Mr. Moran?

3       MR. MORAN:  Yes, your Honor.

4       THE COURT:  And, Ms. Miner, arithmetically, saving

5  your rights as to the matter that has just been argued?

6       MS. MINER:  Yes, your Honor.

7       THE COURT:  All right, so that's the arithmetic

8  calculation.  There's no mandatory minimum here.  I've

9  told you the upward parameters.  Now we come to the most

10  important part, focusing on these offenses, nothing

11  else, um, it's the obligation of the Court to fashion a

12  fair and a just sentence for Mr. Walshe.  I'll hear the

13  government, I'll hear defense counsel, and I'll hear

14  from Mr. Walshe, if he wishes to be heard from.

15       Mr. Moran.

16       MR. MORAN:  Thank you, your Honor.

17       The government's requesting a sentence of, um,

18  principally of 37 months imprisonment, which is the low

19  end of the guidelines --

20       THE COURT:  Again, let me interrupt only as a

21  practical matter, but I want you to develop your

22  argument.

23       He's been in custody now under a federal detainer

24  for 13 months?

25       MR. MORAN:  No.

1    THE COURT:  That's disputed, I take it, because

2    the defense says he should get credit for that?

3    MR. MORAN:  Right, and I -- at the risk of sort of

4    losing all momentum in my sentencing argument, I can

5    address this procedural matter.

6    THE COURT:  Go ahead with your momentum so long as

7    you do at some time, because again, as a practical

8    matter, I need to have that in mind and I want to.

9    MR. MORAN:  All right.  So he was never arrested

10   on a federal -- he was arrested on a federal charge,

11   spent 3 days in custody, we reached an agreement on the

12   conditions of pretrial release, um, he pled guilty and

13   was on release throughout the pendency of the hearing --

14   of all of our hearings.  He was arrested on a state

15   warrant.  Probation did request a detainer and a

16   warrant, I believe, issued -- a federal warrant issued

17   just to make sure we did not lose him at any point.  He

18   has not left state custody.  So I do not believe that he

19   gets any credit for the state custody because I believe

20   that that time would be, I think not obviously BOP --

21   THE COURT:  And now I've taken you off your merits

22   argument, but let me try to follow this out.

23   The state charges are very serious charges.  If

24   he's not guilty of those charges, then whatever sentence

25   I impose upon him today is, so far as we know, the only

1    -- there's no other detainer, isn't that right?

2         MR. MORAN:  Correct.

3         THE COURT:  Contrary-wise, if he's convicted of

4    those charges, at least at some level, there is in

5    effect a mandatory sentence.  And, um, again, as a

6    practical matter, this sentence ought run concurrent,

7    um, whatever it may be.  That aside the 13 months,

8    whatever it may be it ought be concurrent with the

9    justice of the Commonwealth should that be the

10   eventuality.

11        MR. MORAN:  Yes, I would agree that it has to run

12   concurrent.

13        THE COURT:  All right.  Then go ahead with the

14   momentum of your argument.

15        MR. MORAN:  I'll do my best, your Honor.

16        I wanted to start by reviewing the facts because I

17   know your Honor has read all the material, but it's a

18   long story, it actually starts in 2011, to bring us to

19   where we are today, and I think the length of time and

20   the number of people involved demonstrate both the

21   sophisticated nature of the fraud and the harmfulness to

22   the victims and other people who are involved.

23        So take us back to 2011, the defendant acquired

24   the paintings from Victim Number 2, who was his friend

25   in South Korea.  The paintings were not stolen, the

friend gave them to the defendant, Mr. Walshe, to sell
for him.  At some point, likely from the very beginning,
Mr. Walshe formed the intention to keep either the
paintings or the proceeds or both, and that's what he
did.  And it's significant that although this case is
not charged until 2018, we see the fraudulent conduct
start right from the beginning in 2011, because he does
a couple of things right from the beginning.

First of all, he has a set of fake paintings made
by an artist who at the time was making fake Warhols, he
doesn't tell that person that he's planning to sell
those fakes as real.  And that, I think, is the first --
that person is not a statutory victim, but the first
person to whom he lied and manipulated.

He attempts to sell them to some galleries who
don't want to do business at the time, but he does sell
them in 2011 and then -- the originals that is, and then
they take off on a course on their own, which we did not
really learn until after the first set of sentencings,
he never told anyone what actually had happened to the
real paintings.  So those are gone to us, we've lost
track of them when they left the country, and we're
unable to track them any further, but they go through a
series of hands.

In 2015, that set that he had created in 2011 he

1    sells to Victim 3 in France, that is a statutory victim.

2    He also sells a set of "Dollar Signs," another Andy

3    Warhol piece, to another person who is made whole and is

4    not a victim for our purposes.  But it's another person,

5    and to whom he's lying, whom he's manipulating, whom

6    he's engaging in fraud with.

7         On November 16th we get to the actual charges in

8    this case, which is that he advertises the originals,

9    which are long gone at this point, for sale on ebay, and

10   he had another set of counterfeit paintings created by

11   another artist who did not realize that she is creating

12   counterfeits, the story he told her was "It's for

13   insurance purposes, I'm going to keep the real

14   paintings, I'm going to put these on the wall."  And so

15   although not a charged victim, she's another person who

16   is manipulated and who, unbeknownst to herself, is

17   entwined with his fraudulent activity.

18        The sale in 2016 goes through, that person's our

19   Victim Number 1, he realizes it, attempts to get the

20   money back from the defendant, and he's the person who

21   then reaches out to the FBI, which launches the

22   investigation and brings this whole series of falsehoods

23   and lies and manipulations eventually to light.

24        I think that's important in terms of sentencing,

25   not just because it's the history of the case, but

1　because it goes to what this case actually is, which is

2　a sophisticated art fraud.  You've got a series of

3　victims over the years who have gotten into a

4　sophisticated, hard to enact fraud involving obtaining

5　fake paintings, you've got multiple countries involved,

6　we've got multiple methods involved, and this is not an

7　easy thing to do, it's serious and it's also hard to

8　detect, and that's one of the reasons why we think a

9　serious sentence is warranted and simply restitution is

10　not enough, because otherwise he'd be no worse off than

11　if he never attempted the fraud or no other fraudster

12　would be worse off when considering it.

13　　　　We included in our original --

14　　　　THE COURT:  I guess I don't follow that.

15　　　　MR. MORAN:  Well one argument in a fraud case is

16　"Well we'll just make him pay restitution."  We believe

17　a sentence of imprisonment is necessary both to punish

18　him and to deter others who might consider an art fraud,

19　because they are hard to detect.  One thing we included

20　in our original sentencing memo, um, which I hope your

21　Honor at least saw but did not read the voluminous page

22　by page, um, is we had a 97 page -- rather a, um, an

23　actual report commission to prove that the painting

24　wasn't -- the one that the victim bought wasn't what

25　Mr. Walshe said it was.

1      It's interesting to me, as sort of an intellectual

2  matter, what's significant here is it's really hard to

3  prove that a piece of art is or is not what you say it

4  is.  It's an industry which is at risk of fraud.  It's

5  hard -- it's easy to be fraudulent, it's hard to prove

6  fraud, and it's a high-cost industry.  So there is an

7  important -- regardless of what happens to Mr. Walshe,

8  there's an important deterrence message to be sent here,

9  which is that art fraud is wrong, and maybe hard to

10  detect, but it will be detected, and if you engage in

11  it, as easy as it may seem in the beginning, you will be

12  punished.  So that's one part of the argument here.

13      Second, your Honor, I want to talk about the

14  victims.  They are not here today, they come from

15  California and South Korea and France.  So coming here

16  would be difficult for them.  And this has been a long

17  process.  I think at some level they've sort of said to

18  themselves, "I can't keep being involved."  But the --

19  this has been hard and continues to be hard for each of

20  them in different ways.

21      First of all, Victim Number 2 in South Korea was

22  Mr. Walshe's friend, and so in addition to the financial

23  loss, obviously there's issues of betrayal, it's a more

24  personal and harmful victimization.

25      Victim Number 1 runs a Warhol dealership in Los

1  Angeles, this hits him where he lives, this is his
2  professional life.  He detected the fraud.  But
3  nevertheless, in addition to the monetary loss, which
4  matters a lot because that's his livelihood, it hits him
5  where he lives.
6      And finally Victim Number 3, who is an art
7  consultant in France, I think it's been the hardest on
8  him.  And I have to admit that, um, you hear an art
9  consultant who's been the victim of art fraud, at one
10  level you think to yourself, "Oh, well that must be" --
11  as I just mentioned, fraud is not uncommon in the art
12  world, it's sad, but maybe at some level he thinks this
13  is the cost of doing business.  That was perhaps an
14  assumption that I leapt to before I got to know Victim
15  Number 3.  That's not at all the case here.
16      Victim Number 3, because he thought it was a good
17  investment, um, attracted his father to invest his
18  father's life savings in the purchase from Mr. Walshe.
19  They have now become estranged over this.  So I can't
20  imagine -- aside from violence, I can't imagine a more
21  harmful effect than having lost the relationship with
22  one's parents.  So I can't underestimate how harmful
23  this fraud has been.
24      The last thing I turn to, your Honor, is the
25  defendant.  Your Honor has made the finding of

1   obstruction and that's significant because I think it
2   contradicts any suggestion that the defendant might make
3   of being rehabilitated.  At this point he has little
4   prospect of restitution, at least under the current
5   situation, and, um, it's -- there was a lot of talk
6   previously, as there often is in financial cases, about
7   saying "Well he shouldn't go to jail so that he can make
8   restitution," yet I think the obstruction puts that to
9   rest, not to mention the circumstances he's in.  At this
10  point I don't think he has -- in comparison to the
11  harmfulness of the crime and the illegality of the
12  crime, there's little to sort of put on his side of the
13  balance.  So I think a sentence of imprisonment is
14  certainly warranted here.
15       The last thing I will note, your Honor, is we
16  requested 37 months in prison, which is the low end of
17  the guidelines.  The way I reached -- under the plea
18  agreement we said that we would recommend incarceration
19  at the low end of the guidelines, as calculated by the
20  parties, but that calculation by definition did not
21  include obstruction.  In the government's view, um, that
22  provision of the plea agreement would no longer be
23  binding because of the obstruction.
24       I'll also note that the plea agreement would have
25  permitted us to withhold -- we can make the argument to

1　　your Honor to withhold acceptance, which would put his

2　　guidelines even higher.  And so we're still below where

3　　we could have been under the plea agreement, um, if

4　　probation applied the acceptance of responsibility, he

5　　did plead guilty, and I am familiar with your practice

6　　in this session regarding acceptance.  So we think the

7　　better, wiser course is the low end of the guideline as

8　　they were just determined by your Honor.

9　　　　　THE COURT:  Thank you.

10　　　　　Ms. Miner.

11　　　　　MS. MINER:  Thank you, your Honor.

12　　　　　Let me continue to recommend a sentence of

13　　time-served, we think it's appropriate in this case.

14　　　　　To say that there's nothing on his side of the

15　　table is really misrepresenting things.  Mr. Walshe did

16　　plead guilty, he started making restitution payments.

17　　As your Honor knows, there's not even a restitution

18　　order to this day, and up until this day he's made

19　　approximately $95,000 worth of restitution.  He was

20　　making payments on it.

21　　　　　Mr. Moran talked about "Oh, they couldn't find the

22　　original paintings."  Well, your Honor, they found them.

23　　Do you know why they found them?  Because Mr. Walshe

24　　told them who he sold them to.  And once he told them,

25　　once he accepted responsibility, they tracked them.

1   Judge Woodlock wanted them to track them and they did.

2   And the way they were able to do that is because

3   Mr. Walshe told them where they -- he told them who he

4   sold them to, which then allows them to do the work of

5   tracing them.

6        Your Honor, this is a fraud case, um, it may be

7   hard to detect in art fraud, but fraud is fraud.  And

8   it's -- there are people out there who make it easy or

9   make it hard.  I mean there are people that do

10  reproductions.  There are people that do reproductions

11  that include the signature of the artist, not just a

12  reproduction where they put their name on it, they do

13  reproductions with the signature of the artist, of

14  course that makes it easier.  Right?  So to say that the

15  people who did the reproductions are victims, I think is

16  a little bit of an overstatement, and I believe Judge

17  Woodlock found that.

18       Mr. Walshe had turned himself around, your Honor,

19  he was working towards restitution, he was working on

20  self-help, he was doing things for charity, he was

21  raising his three boys, he was taking care of his

22  mother, and, um, once he accepted responsibility, he did

23  it wholeheartedly.  I mean we just signed today, um,

24  papers agreeing to forfeit a fake painting.  Anything

25  that the government has asked him to do, since he

1  accepted responsibility, he has done in full and he
2  continues to do.

3  Whether he can make restitution or not?  Obviously
4  he cannot right now, but if he is acquitted in the state
5  court case, um, he will be out and he will be able to
6  work, and he is an intelligent man, and he'll work off
7  the restitution.  He's never tried to shirk his
8  responsibilities on that respect.  Like I said we never
9  argued in front of Judge Woodlock that full restitution
10 shouldn't be ordered, we never argued a fine --
11 THE COURT:  Let me ask about the restitution.
12 From the papers that I have, it looks like somewhat --
13 slightly more than $95,000 has been recovered toward a
14 restitution of what, $475,000?
15 MS. MINER:  $475,000, your Honor.
16 THE COURT:  And you agree with that?
17 MR. MORAN:  Yes, your Honor.
18 THE COURT:  Thank you.
19 Go ahead, Ms. Miner.
20 MS. MINER:  And that was money from Mr. Walshe's
21 fund.  He's also agreed to have his bail of $75,000 put
22 towards restitution.  So even a -- it's not in an
23 account -- well it is in an account fund, but it's
24 there, um, also available.  So he has done what he can
25 do to make amends, your Honor.

He has been sitting in jail since January 8th -- not 18th, I think the probation report says the 18th, but it's actually just January 8th, but approximately 13 months.  There was a federal detainer, um, filed the same day, which was January 8th, and there were discussions between the Feds and the state over who should keep -- whether they should turn it over to the Feds and let the Feds pay for it or whether the state should pay for it, it was decided that they would not release him to the Feds, they would keep him.  But he's been in jail since January of 2023 and we believe those 13 months should count.

I have talked to Mr. Moran and I do think we agree that in order for them to count, you just have to subtract them from whatever sentence you would impose, because you can't --

THE COURT:  Oh, I understand that, but I now understand his disagreement.  Mr. Moran may agree with that procedurally.

MS. MINER:  He agrees with it procedurally, he disagrees that he should get credit for it.

THE COURT:  I understand.

MS. MINER:  We say he's been in jail, he would have been -- it's happenstance that he happens to be under state custody versus federal custody, he would

1    have been in federal custody the exact same day, he

2    would have gotten credit if they would have moved him

3    over here.  But for whatever reason, they decided to

4    keep him in state custody.  So we believe that the 13

5    months absolutely should count, um, towards any sentence

6    your Honor imposes, and we would ask that you simply

7    reduce whatever you would impose on that.  Because he

8    has been sitting there -- as your Honor is one of the

9    biggest advocates of, he's sitting there, he's innocent

10   of that crime, but he is guilty of this crime.

11        Thank you.

12        THE COURT:  Thank you.

13        Mr. Walshe, you have the right to talk to me

14   directly.  You're not required to say anything.  If

15   you'd like to, I'll hear you now.

16        THE DEFENDANT:  Um, I appreciate being offered the

17   opportunity.  At this time I don't have anything to add,

18   other than "Thank you very much."

19        THE COURT:  Very well.

20        (Pause.)

21        THE COURT:  Mr. Brian Walshe, in consideration of

22   the provisions of 18 United States Code, Section

23   3553(a), the information from the United States

24   Attorney, your attorney, the probation office, and

25   yourself, this Court sentences you to 13 -- strike that,

1    sentences you to 37 months on each of the counts of

2    conviction, the sentence on each count of conviction to

3    run concurrent, one with the other, and concurrent with

4    any state sentence if any state sentence should

5    eventuate.  The Court imposes -- and to be followed by 3

6    years of supervised release with all the general and

7    special conditions of supervised release set forth in

8    the presentence report.

9         The Court imposes no fine due to your inability to

10   pay a fine.  The Court imposes restitution of $475,000

11   and credits you with payment toward that restitution of

12   $95,077.97.  Let me explain this sentence.

13        The primary driver of this sentence for art fraud

14   is the necessity for deterrence in a situation where

15   fraud is not uncommon, hard to detect, and it is

16   important in the eyes of this Court that those who

17   engage in it be deterred, and so it is general

18   deterrence that this Court, um, is basing the sentence

19   on.

20        I do credit you with those efforts you have made

21   subsequent to your arrest with respect to this art fraud

22   case, but it is the view of this Court that such a

23   sentence is sufficient but not greater than necessary to

24   accomplish the goals of the criminal justice system.

25        Now you have the right to appeal from any findings

or rulings the Court has made against you.  Should you appeal and should your appeal be successful in whole or in part and the case remanded, you'll be resentenced before another judge.  Ms. Miner, if an appeal is decided upon and you want transcript, seek it from this session of the court because I'll turn it around right away.

Do you understand?

MS. MINER:  Yes, your Honor, thank you.

THE COURT:  Now he's in state custody and having announced that sentence, I think I should remand him to the custody of the state?

MR. MORAN:  He returns back to the state pursuant to the writ of habeas corpus ad prosequendum.  My only request, your Honor, is that Judge Woodlock issued orders of forfeiture, which you include those in the judgment, and those are Documents 140, 113, and 163.

THE COURT:  Those will be included in the judgment.  That's the order of the Court.  We'll recess.

THE CLERK:  All rise.

(Ends, 3:15 p.m.)

1            C E R T I F I C A T E

2

3       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

4    hereby certify that the forgoing transcript of the

5    record is a true and accurate transcription of my

6    stenographic notes, before Judge William G. Young, on

7    Tuesday, February 20, 2024, to the best of my skill and

8    ability.

9

10

11

12

13   /s/ Richard H. Romanow 02-28-24
     _____
14   RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25